# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

SUSAN MARIE CLARK LOWRY,     )
              )
         Plaintiff,     )
              )
     v.            )     Civil Action No. 2:07-cv-0053
              )     Judge Wiseman/Brown
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,    )
         Defendant.    )

To:    The Honorable Thomas A. Wiseman, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security denying plaintiff disability insurance benefits (DIB) and supplemental security income (SSI), as provided under Titles II and XVI of the Social Security Act ("the Act") as amended. The case is currently pending on plaintiff's motion for judgment on the administrative record. (Docket Entry 8). For the reasons stated below, the Magistrate Judge recommends that plaintiff's motion for judgment be **denied**, and the decision of the Commissioner be **affirmed**.

## I. INTRODUCTION

Plaintiff filed a Title II application for a period of disability and disability insurance benefits (DIB) under the Social Security Act ("the Act") on December 18, 2003. (Tr. 14, 51-53). She also protectively filed a Title XVI application for supplemental security income (SSI) under the Act on November 13, 2003. (Tr. 14). Plaintiff's claim was denied initially on April 12, 2004, and upon reconsideration on October 1, 2004. (Tr. 14, 37, 42). On December 29, 2005,

1

Thomas C. Prince, Jr., M.D., Plaintiff's treating physician, gave a deposition about the Plaintiff's's treatment history. (Tr. 239-254). At Plaintiff's request, an administrative law judge (ALJ) conducted a hearing on June 5, 2006. (Tr. 14, 269-302). Plaintiff, who was represented by counsel, and Julian M. Nadolsky, a vocational expert, testified. (Tr. 14, 269-302). On October 23, 2006, the ALJ issued a written decision, denying Plaintiff's claims for DIB and SSI. (Tr. 11-21). The ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2.  The claimant has not engaged in substantial gainful activity since February 5, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: a neck disorder, headaches, and anxiety (20 CFR 404.1520) and 416.920)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work. The claimant should avoid hazards. She is mildly limited in her ability to concentrate. The claimant can reach overhead occasionally, but not frequently (occasionally is defined as up to one-third of the workday), and can turn her head to the left. The claimant requires a sit/stand option.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and

2

416.965).

7.   The claimant was born on January 26, 1961, and was 40 years old on the alleged

disability onset date, which is defined as a younger individual age 18-44 (20 CFR

404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English

(20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because

using the Medical-Vocational Rules as a framework supports a finding that the claimant

is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41

and 20 CFR Part 404, Subpart, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional

capacity, there are jobs that exist in significant numbers in the national economy that the

claimant can perform (20 CFR 404.1560(C), 404.1566, 416.960(C), and 416.966).

11.  The claimant has not been under a "disability," as defined in the Social Security Act,

from February 5, 2004, through the date of this decision (20 CFR 404.1520(g) and

416.920(g)).

(Tr. 16-20).

Plaintiff has filed a motion for judgment on the administrative record, asking the Court to

reverse the ALJ's decision and to award her benefits.  (Docket Entries 8-9).  Alternatively, the

Plaintiff asks the Court to "remand the case back to the administrative level pursuant to Sentence

Four of 42 U.S.C. § 405(g).  (Docket Entries 8-9).

Case 2:07-cv-00053   Document 17   Filed 11/07/08   Page 3 of 30 PageID #: 67

## II. REVIEW OF THE RECORD

Plaintiff was forty years old at the time of the alleged disability onset date and forty-three years old at the time of application. (Tr. 19; Docket Entry 9, p. 1). Plaintiff completed high school and thereafter spent four years in the U.S. Navy. (Tr. 274-75; Docket Entry 9, p. 1). She has past relevant work as a veterinary technician, in which she engaged for seventeen years. (Tr. 19). This job involved "assisting the doctor, prepping surgery animals, both large and small, [and] vaccinations . . .," as well as lifting animals that weighed anywhere from fifty to one hundred pounds. (Tr. 276). This job is typically classified as a medium, skilled occupation. (Tr. 295).

Plaintiff, Ms. Susan M. Clark Lowry ("Ms. Lowry" or "Plaintiff")[1], was injured in an automobile accident in August of 2001, when another car, traveling at 65 miles per hour, rear-ended her when she was stopped and waiting to turn left. (Tr. 194; Docket Entry 9, p. 4). This accident injured her cervical spine, as demonstrated by the clinical and diagnostic surveys ordered by the emergency room doctor, Dr. David McKinney. (Tr. 194, 207; Docket Entry 9, p. 4). The MRI showed "some straightening of the cervical spine[, but] the disc spaces [appeared] well preserved." (Tr. 140). Dr. McKinney noted that claimant did not have an acute fracture, dislocation, or subluxation of the cervical spine. (Tr. 140). Additionally, Ms. Lowry had some "moderate osteophyte formation . . . anteriorly at the C5-C6 level," as well as "mild degenerative changes" of the thoracic spine. (Tr. 140; Docket Entry 9, p. 4-5). However, there was no

[1]The Magistrate Judge notes that sections of the record refer to claimant as Ms. Clark, whereas other times she is referred to as Ms. Lowry. It appears that Plaintiff was married after filing her applications. (TR. 274). For purposes of consistency, she will be referred to hereinafter as Ms. Lowry or Plaintiff.

4

definite acute abnormality of the thoracic spine.  (Tr. 141).

After the accident, she worked part-time as a veterinary assistant until February 2004, when she determined that "physically, she was not able to manage her job any longer, and she was having some difficulty in terms of things 'getting on [her] nerves.'"  (Tr. 216-17).  She claims that, as of August 1, 2001, she was "unable to work because of [her] illnesses, injuries or conditions."[2]  (Tr. 60).  However, the record demonstrates that Ms. Lowry continued her employment until February 5, 2004, with the following accommodations.  (Tr. 272).  The veterinarian tried to accommodate Ms. Lowry by allowing her to work part-time and to do less strenuous tasks.  (Tr. 278-79).  For instance, she no longer worked with large animals, nor did she help with surgery.  (Tr. 278).  At times, she worked at the computer and answered phones when needed.  (Tr. 279).  In a Work Activity Questionnaire, the owner of the veterinary clinic stated, "Frankly, I am allowing these conditions to exist because Susan is very capable when she wants to be.  I am not sure she is actually having as much problem as is believed. I realize that I am not qualified to make that determination, however." (Tr. 73).  Plaintiff's former boss indicated that he allowed irregular hours, less hours, more rest periods, lower production as well as frequent absences. (Tr. 73). When asked about her attempt to work, the owner of the clinic noted that she was frequently absent and her work was sometimes satisfactory.  (Tr. 74).  Ms. Lowry alleges that the veterinarian eventually asked her to leave because he did not like that she was only working part-time.  (Tr. 290).

_____

[2]However, during the June 5, 2006, hearing, Plaintiff amended her alleged onset date from August 1, 2001, to February 5, 2004, the day she actually left her employment.  (Tr. 272). Ms. Lowry worked for several years after the accident with the accommodations as outlined above.

5

After the car accident, Ms. Lowry regularly visited a chiropractor throughout 2002 and 2003. (Tr. 279-80). She received therapy and massage therapy, and she also used a TENS machine. (Tr. 280). Plaintiff testified that these treatments provided temporary relief. (Tr. 280, 285). She complained of daily chronic headaches as well as pain that caused her back to feel "like it's on fire." (Tr. 281). Her treating physician, Dr. Prince, prescribed her a muscle relaxer, pain medication, and Amitriptyline (to help with sleeping). (Tr. 281). The medication, however, makes her extremely tired, thereby making it difficult to concentrate. (Tr. 282, 291). Further, she has experienced depressive symptoms from the chronic pain. (Tr. 282). Lastly, Plaintiff testified that she takes Baxtra, an arthritis medication. (Tr. 283).

Ms. Lowry claims she can sit for thirty minutes to an hour and walk for five minutes. (Tr. 282-83, 287). Walking alleviates her pain, but the weather affects the degree of pain she feels. (Tr. 283). She claims she has some trouble turning her head to the right, but she can barely turn her head to the left, as she can only reach her head from "[n]ot quite [her] chin to [her] shoulder." (Tr. 284). Her pain, on a scale of one to ten, is "anywhere from seven to nine. It's "constant chronic pain." (Tr. 291). Since the accident, she has had trouble eating, which has caused her to lose weight. (Tr. 64, 95). As of July 10, 2004, Ms. Lowry – at five feet, seven inches tall – weighed 110 pounds. (Tr. 95).

Ms. Lowry testified that she can engage in some chores and grooming activities, depending on the day. (Tr. 288). She also cares for her pets, specifically two dogs and two parrots. (Tr. 103, 288-289). Ms. Lowry is capable of personal care, such as using the toilet and feeding herself. (Tr. 103). She also reads, watches television, and sits outside. (Tr. 106, 288). With regard to driving, Ms. Lowry testified that she drives at a slow pace and cannot get on the

6

highway. (Tr. 286). Ms. Lowery further testified that she can walk a couple hundred feet at a time and/or for about five minutes. (Tr.283, 287). Plaintiff also testified that while her pain medication does help with the pain, it makes her feel lethargic, fatigued, and moody. (Tr. 291). Lastly, Plaintiff reported that she does not sleep well at night because of the pain and cannot lay down in the same position for long periods. (Tr. 284).

A. Thomas C. Prince, M.D., Treating Physician

Ms. Lowry began seeing Dr. Thomas C. Prince, a general and thoracic surgeon, on January 21, 2002. (Docket Entry 9, pp. 4-5). The record indicates that Plaintiff was last physically seen by Dr. Prince approximately eight months later, on September 16, 2002. (Tr. 258). During his treatment of Ms. Lowry, Dr. Prince compared the impact of the car that rear-ended Ms. Lowry to the impact of a car "being dropped from a three story building or greater." (Tr. 207). Dr. Prince also noted that, at the time of her first visit, she was working about two days a week, sometimes more. (Tr. 262). Dr. Prince further noted that Ms. Lowry reported that because she has a "tremendous amount of pain in her neck and back[,]" she has to visit the chiropractor about three times a week. (Tr. 262). Dr. Prince noted that these visits would help, but the pain in between the shoulder blades and in the back of the neck would always return after Ms. Lowry worked for awhile. (Tr. 262). Plaintiff further reported that she still had "some swelling in the neck and pain on motion," while also complaining of "tremendous headaches." (Tr. 262).

Upon review of x-rays and an MRI, as well as an examination of the Plaintiff, Dr. Prince diagnosed Ms. Lowry as having "severe cervical strain, [which is] the neck and neck muscles and ligaments; . . . severe trapezius, [which is] the muscle in the neck and shoulder; and upper

thoracic muscle strain." (Tr. 244, 262). He determined that Ms. Lowry can only bend forward about ten degrees and cannot bend backward. (Tr. 262). Dr. Prince opined that it is painful for Ms. Lowry to look to the ceiling, and movement of her arms is somewhat limited. (Tr. 262). She can only turn her head about five to seven degrees to the right and thirty-five to forty degrees to the left.[3] (Tr. 262).

Dr. Prince also stated that claimant has spondylosis of the cervical spine, some degenerative disk disease, and facet traumatic arthritis, after reviewing an MRI of Plaintiff's cervical spine. (Tr. 245). Dr. Prince noted that Ms. Lowry is in the beginning stages of cervical spinal stenosis, which would affect her strength and ability to ambulate. (Tr. 247). Moreover, Dr. Prince opined that Ms. Lowry has bone spurs resulting from the injury, which create a painful condition that Dr. Prince believes "is expected to be disabling more than twelve months" and permanent. (Tr. 245). She also has "swelling around the nerve in the spinal cord." (Tr. 247). Dr. Prince also opined that Plaintiff's muscles and ligaments that were torn will never heal because of the extensive damage. (Tr. 246). Dr. Prince told Ms. Lowry to continue visiting the chiropractor and prescribed her Soma and Mobic, as well as Lorcet Plus for the pain. (Tr. 262). He noted that the Flexeril she had been taking showed little results and that she had been taking Naprosyn for the pain sometimes. (Tr. 262).

On February 18, 2002, Dr. Prince noted that "her situation is now a [nine] compared to being a [ten] last time," and that it was affecting her sleep. (Tr. 261). Due to the extreme pain Plaintiff was still reporting, Dr. Prince prescribed her a "consistent scheduled dose of sustained

---

[3]At the June 5, 2006, hearing, Ms. Lowry claimed that she had some trouble turning her head to the right, but that the main problem was with the left. (Tr. 284). This appears to somewhat contradict Dr. Prince's findings. (Tr. 262).

8

release OxyContin" (20 mg size one b.i.d.) as well as Hydrocodone and Elavil (25 mg). (Tr. 261). Two days later, Dr. Prince was informed that Ms. Lowry was sleeping better and "felt good enough . . . to go back to work" – a success that Dr. Prince attributed to the OxyContin and Elavil. (Tr. 261).

On March 18, 2002, Dr. Prince stated that Ms. Lowry was about a seven to seven and a half on a scale of ten. (Tr. 261). She still had limitations on turning to the right, and "some pain on palpation of the neck and the upper back," yet her lower back was doing well. (Tr. 261). Dr. Prince continued to recommend the medications prescribed on February 18, 2002, and wrote her limitations on work: she was not to "lift over [twenty] pounds," nor was she to "work over [thirty] hours a week." (Tr. 261).

Dr. Prince saw Ms. Lowry again on April 29, 2002, and he advised her to take the Amitriptyline prescribed, as she told him she was not taking it – nor the OxyContin – as she should. (Tr. 261). At that time, Ms. Lowry was still seeing a chiropractor. (Tr. 261). While she continued to be limited in her ability to turn her head to the right and somewhat to the left, her backward and forward bending had improved. (Tr. 261). Plaintiff reported that her right posterior cervical muscles were still bothering the her. (Tr. 261).

On June 3, 2002, Dr. Prince noted her severe neck pain, grinding noise in the neck, and tenderness and muscle spasms between the shoulder blades. (Tr. 260). He prescribed her an RS-41 stimulator, and on June 17, 2002, she was instructed on its use. (Tr. 260). At that time, Ms. Lowry stated she was slightly better and capable of some driving without much fear. (Tr. 260). She still complained of headaches and neck pain. (Tr. 260).

On July 15, 2002, Ms. Lowry was a six on a scale of ten with regard to pain, and her neck

was still grinding whenever she turned her head.  (Tr. 260).  The stimulator was having much success in battling the muscle spasms although she still experienced tenderness at the "base of the skull and down the posterior cervical muscles."  (Tr. 259, 260).

On August 19, 2002, claimant stated she has "good days and bad days" and still uses the stimulator, as it gives her relief after a partial day of work.  (Tr. 259).  She noted that she continues to experience a sharp, severe pain when she turns her head too far to the right (for instance, when she drives and looks back over her shoulder).  (Tr. 259).  This is followed by a "lancinating type pain radiating over the right ear and scalp."  (Tr. 259).  Additionally, she has spasms of the right posterior cervical muscle.  (Tr. 259).  Dr. Prince used measurements of her neck rotation, bending, and extension to determine the level of permanent impairment under the American Medical Association guide, Fifth Edition.  (Tr. 259).  He determined that the claimant has sustained a 13% permanent impairment of the whole body.  (Tr. 259).  Dr. Prince diagnosed Plaintiff as having "chronic cervical strain secondary to trauma (motor vehicle accident) with a 'whiplash' type injury." (Tr. 259).

On September 16, 2002, Dr. Prince stated that the claimant was still having problems and had not made real progress.  (Tr. 258).  Ms. Lowry informed him that she still sees the chiropractor from time to time.  (Tr. 258).  Dr. Prince continued to prescribe OxyContin 20 b.i.d. and generic Lorcet Plus for pain with the recommendation that she continue with her chiropractic treatment.  (Tr. 258).  Finally, he noted that he will probably not have to see her again, as her situation will be permanent.  (Tr. 258).  However, on December 20, 2002, Plaintiff's mother informed Dr. Prince that Ms. Lowry was out of some of her medication and experiencing a lot of pain.  (Tr. 258).  Further, Plaintiff's mother claimed Ms. Lowry's chiropractor believes she has

nerve damage. (Tr. 258). Thus, Dr. Prince wanted to get an MRI or an EMG of claimant's upper extremities. (Tr. 258). However, the Magistrate Judge was unable to locate any such MRI or EMG in the record.

In February 2004 and July 2004, Dr. Prince wrote letters stating that he deems claimant "totally and permanently disabled for obtaining work in the workplace." (Tr. 207-08). He diagnosed her as having "permanent impairment involving [the] cervical spine, upper thoracic area, and shoulder." (Tr. 207-08).

In his deposition on December 29, 2005, Dr. Prince stated that secretarial work would be practically impossible with this injury, as would require Plaintiff to remain in a sitting position while changing "the position of her neck in answering the phone, typing, [and working on the] computer." (Tr. 249). Dr. Prince testified to his belief that Ms. Lowry is telling the truth about her pain, that objective medical evidence supports the severity of that pain, and that such a condition can be reasonably expected to cause such disabling pain. (Tr. 250). Dr. Prince further testified that to function fully, she must take pain medication. (Tr. 251). However, the amount of medication necessary to battle the pain causes drowsiness that makes it difficult to function. (Tr. 251). Further, Dr. Prince testified that he had reviewed listing 1.04 of the Social Security Regulations and believes her condition satisfies that listing, based on clinical and diagnostic evidence, as well as his previous examinations of the claimant. (Tr. 252). Dr. Prince opined that Plaintiff had severe cervical strain, spondylosis, and bone spurs. (Tr. 244-245). Further, Dr. Prince testified that to improve her pain, Ms. Lowry should stay off her feet, could lift less than ten pounds very infrequently, and has considerably restricted walking. (Tr. 248-249).

B. Edward Johnson, M.D., Social Security Consultative Physician

Dr. Johnson is a Social Security consultative physician who examined Ms. Lowry on March 29, 2004. (Tr. 193). Dr. Johnson noted that Ms. Lowry had a car accident in August 2001 that injured her cervical spine, and she last worked as a veterinary assistant in February 2004. (Tr. 194). Ms. Lowry reported that she "experiences pain in the cervical spine with radiation between the scapulae," "has tingling in both arms." (Tr. 194). Further, Plaintiff reported that she has begun "experiencing a deep aching burning pain in both legs," has headaches daily, and does not sleep well due to the pain. (Tr. 194). Dr. Johnson noted that Plaintiff had received anti-inflammatory medication and chiropractic treatment, as well as a TENS unit that has yielded some relief. (Tr. 194). At the time of her examination, Plaintiff was 65 inches tall and weighed 108 pounds. (Tr. 194).

Dr. Johnson opined that Plaintiff's range of motion in her cervical spine was restricted in ventral motion to less than 10 degrees, dorsal 15 degrees and lateral rotation 15 degrees. (Tr. 195). Further, Dr. Johnson noted that there was a full range of motion in the lumbar spine and a full range of motion of all joints with exception of both shoulders where abduction and flexion were restricted to 160 degrees due to cervical pain. Additionally, Dr. Johnson found that Plaintiff walked with a normal gait and could perform normal walking tests, had some difficulty performing a squat, and was on and off the exam table unassisted. (Tr. 196).

Dr. Johnson concluded that x-rays showed mild spondylosis of the facet joints throughout the cervical spine, a bone spur at C-5, and loss of a normal lordotic curve. (Tr. 196). Further, Dr. Johnson noted that there are significant restrictions in cervical motion as well as paraspinal muscle spasm and that Plaintiff is experiencing persistent pain and daily headaches. (Tr. 196).

12

Based on the objective medical findings, Dr. Johnson concluded that Ms.Lowry would have difficulty performing any overhead lifting, but should be able to occasionally lift and carry 10 to 15 pounds, frequently 10 pounds, sit and stand or walk for up to six-hour intervals.  (Tr. 196).

     C.  <u>Robert Newton, D.C., Chiropractor</u>

     Robert Newton, D.C., began seeing Ms. Lowry as a patient on September 7, 2001, and he noted that she had been in a car accident and had cervical pain and severe headaches.  (Tr. 186).  At the initial visit, he noted that movement, turning the head, and staying immobile for long periods of time aggravated her condition, and that medication helped to alleviate the pain.  (Tr. 186).  Ms. Lowry also complained of sharp stabbing, numbness, and tingling.  (Tr. 186).  Treatment goals were decreased pain and muscle tension, as well as increased strength and stability.  (Docket Entry 9, p. 7; Tr. 186).

     On November 9, 2001, x-rays were taken of Ms. Lowry's spine.  (Tr. 192).  Upon review of the x-rays, Dr. Newton recommended that she get continuous, conservative care.  (Tr. 192).  Dr. Newton saw Ms. Lowry for more than one hundred visits.  (Docket Entry 9, p. 7; Tr. 143-192).  During many of the visits, Ms. Lowry complained of aching and stiffness, as well as cervical pain and headaches.  (Tr. 144-86).  Ms. Lowry compared the pain between her scapulas to that of a knife.  (Tr. 144, 153).  However, Dr. Newton determined that the patient was improving during some of the visits.  (Tr. 144-86).  Plaintiff reported that she has "good days and bad days."  (Tr. 180).  During her final visit with Dr. Newton on May 9, 2003, Ms. Lowry stated that she was having "severe, sharp pain" in the mid trapezius region, as well as headaches and sharp pains over the past six weeks.  (Tr. 144).  Further, she noted that some days were worse than others.  (Tr. 144).  During the June 5, 2006, hearing, Plaintiff stated that the

chiropractic treatment would relieve her symptoms but would not be lasting.  (Tr. 280).  Further,

Plaintiff testified that she no longer went to Dr. Newton because she could not afford to go to the

doctor.  (Tr. 280).

    D.  <u>Residual Functional Capacity Assessments</u>

        1.  <u>Dr. George W. Bounds, Jr., Physical Assessment</u>

A Physical Residual Functional Capacity Assessment (RFC) was completed on April 1,

2004, by Dr. George W. Bounds, Jr.  (Tr. 199).  Upon review of the record, including the

physical examination of Dr. Johnson, Dr. Bounds determined that Plaintiff can occasionally lift

and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds.  (Tr. 199).

Plaintiff can stand, walk, and/or sit for about six hours of an eight-hour workday.  (Tr. 199).

Plaintiff is limited in her ability to push and pull using her upper extremities.  (Tr. 199).

Regarding postural limitations, Dr. Bounds noted that plaintiff can frequently climb

ramps or stairs (and occasionally climb a ladder, rope, or scaffold).  (Tr. 200).  She can

frequently balance, kneel, crouch, and crawl and can occasionally stoop.  (Tr. 200).  She is

limited in her ability to reach overhead but is capable of other forms of manipulation.  (Tr. 200).

Ms. Lowry does not have any visual, communicative, or environmental limitations.  (Tr. 201-

02).  In reviewing Plaintiff's reported symptoms, Dr. Bounds notes that "[their] severity or

duration . . . is disproportionate to the expected severity or expected duration on the basis of the

claimant's medically determinable impairment(s)."  Dr. Bounds noted that the Plaintiff's

complaints are *partially* credible, as there is "some pain expected in [the] neck causing difficulty

in [the] shoulder area when lifting [or] carrying, but not to [the] extent as alleged."  Dr. Bounds

also noted that Ms. Lowry may have trouble when experiencing headaches but should be able to

14

perform the RFC as above, even when considering the pain. (Tr. 202-204). Further, Dr. Bounds noted that while Dr. Johnson's assessment was supported by his physical examination and other medical records in the file, Dr. Prince's opinion that Plaintiff is permanently disabled is not supported by objective medical evidence in the record. (Tr. 204).

2. Dr. Andrew H. Miller, Physical Assessment[4]

Another Physical RFC Assessment was completed on July 30, 2004, by Dr. Andrew H. Miller. (Tr. 209-14). Upon review of the records, the Dr. Miller found that Plaintiff can occasionally lift and/or carry up to fifty pounds and frequently lift and/or carry up to twenty-five pounds. (Tr. 210). These weights are greater than those determined by Dr. Bounds a few months prior. (Tr. 199, 210). Further, Dr. Miller opined that Plaintiff can stand and/or walk for six hours in an eight-hour workday, can also sit for six hours in an eight-hour workday, and is limited in using her upper extremities for pushing and pulling. (Tr. 210). Dr. Miller also noted that Ms. Lowry is limited in her ability to engage in frequent overhead lifting or bilateral movement and does not have any visual, communicative, or environmental limitations. (Tr. 211-13). These determinations are consistent with those of Dr. Bounds. (Tr. 199, 210). In explaining the exertional limitations, Dr. Miller referred to an x-ray and MRI revealing "some straightening of the cervical spine with moderate osteophyte formation at C5-6." (Tr. 210-11). Dr. Miller notes that Ms. Lowry has been "treated conservatively and has sought chiropractic care" and that no changes appeared on her March 2004 x-rays when compared with her August 2001 x-rays. (Tr. 211). Finally, Dr. Miller notes that Dr. Prince's determination that Ms. Lowry

_____

[4]The ALJ determined that this assessment was contradicted by the weight of the evidence in the record, which demonstrated that Plaintiff had severe impairments that more significantly limited her work activity than those as determined by Dr. Miller.

15

is "totally and permanently disabled" is unfounded because it is not supported by objective data. (Tr. 211). Dr. Miller concludes that Plaintiff is capable of a "full range of activity with a need for help only with the bigger chores." (Tr. 211).

### 3. Stephen Hardison, M.A., Psychological Assessment

Stephen Hardison, M.A., a senior psychological examiner, approved the determinations from a Mental Status Examination of Ms. Lowry that occurred on September 20, 2004. (Tr. 215-19). The exam revealed that Ms. Lowry is an alert individual. (Tr. 217). She appears to "[function] within the low average to average range intellectually." (Tr. 219). Further, plaintiff reported to the examiner that her physical limitations are the main cause of her not being able to manage the demands of being a veterinarian assistant. (Tr. 219, 235). Thus, even though she reports some irritability, stress, and depression, Ms. Lowry does not allege that these conditions have as great an impact on her ability to work as her physical ailments. (Tr. 216-19).

With regard to her social background, the examiner found that Ms. Lowry typically does not like being in public and has not socialized much since the accident. (Tr. 215-16). She has had trouble "getting along with others" and has been "rather irritable and 'snappy.'" (Tr. 217). Plaintiff reported that she experiences depressive symptoms, which are related to her financial problems since she cannot work and experiences chronic pain. (Tr. 216). Ms. Lowry reported that she had thought about suicide and often felt anxious and overwhelmed. (Tr. 216). Plaintiff reported that when she has a headache, she has trouble concentrating. (Tr. 216).

The examiner noted that Plaintiff's reported daily activities – restriction of which is mildly limited – include sitting and watching television, "catnapping," reading, visiting her parents once or twice a week, and visiting with a friend occasionally. (Tr. 217, 233, 235). She

16

does not do much cooking, but she does her own laundry, sweeps, vacuums, and keeps her home rather neat. (Tr. 217). Ms. Lowry goes to the grocery store about once a month. (Tr. 217). Further, she cares for two outside dogs. (Tr. 217). He also notes that "she appears capable of driving independently with no significant limitations." (Tr. 219).

The ultimate conclusion was that Ms. Lowry's symptoms do not "appear to meet criteria for [a] specific disorder," and she was diagnosed as having anxiety NOS. (Tr. 218, 223, 228, 235). Ms. Lowry was found to be only mildly limited regarding concentration and persistence, and she is not limited in her ability to respond well to changes and hazards in the work setting. (Tr. 218-19). Further, Ms. Lowry may be moderately limited in her ability to interact with other people. (Tr. 218). Plaintiff is capable of managing funds. (Tr. 219, 235).

### E. Julian Nadolsky, Vocational Expert

Mr. Julian Nodolsky testified at the June 5, 2006, hearing about the vocational evidence regarding Ms. Lowry's ability to work. (Tr. 293). He stated that her past relevant work as a veterinary technician is usually classified as a "medium and skilled occupation" but at times could be considered a heavy level.

The ALJ posed the following hypothetical: a person who is a younger individual with a high school education and the same work history as the Plaintiff, a history of a neck injury, back pain and neck pain following a car wreck, some anxiety and depression related to these injuries, limited to light exertion as defined in the regulations, must avoid hazards, mild impairment of concentration, occasional headaches, could not relate to others, could reach overhead occasionally but not on a frequent basis, had limited neck rotation, and must have a sit stand option because of neck and back pain. (Tr. 295-296).

17

Based on this hypothetical, the VE determined that she could not "do the previous work any way she did it or as it [is] customarily done" because it is "too physically demanding." (Tr. 296-97). However, the VE testified that there are sedentary and light jobs she is capable of performing, despite her limitations. (Tr. 297). The VE listed light jobs, including "a desk clerk for a hotel or motel, a retail receiving clerk, a gate tender, a dietetic aide in a hospital or an institution . . .[, and] a customer service representative." (Tr. 297). Sedentary jobs include "a telephone solicitor, a surveillance system monitor, a cashier, [and] a telephone answering clerk." (Tr. 298). Additionally, the Ve testified that Plaintiff could work as a receptionist or an appointment clerk. (Tr. 298).

The VE noted, however, that a person with a "severe or marked" level of pain would not be able to attend and remain at such work. (Tr. 299). Further, if the person requires rest during the day that exceeds the normal breaks, that individual would not be able to perform competitive work. (Tr. 298-99). The VE testified that he did not think these jobs would require much motion in the neck, so Ms. Lowry's neck injury would not necessarily prevent her from engaging in the above work. (Tr. 300).

The sedentary jobs require an individual to lift up to ten pounds occasionally and the VE testified that he did not "believe she would be able to hold a job if she could lift even ten pounds on an infrequent basis." (Tr. 299).

### III. CONCLUSIONS OF LAW

A. <u>Standard of Review</u>

This Court must review the entire record to determine if the Commissioner's findings are upheld by substantial evidence. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The

purpose of this review is to determine (1) "whether substantial evidence exists in the record to support the Secretary's decision," and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B. Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)    If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)    If the claimant is not found to have an impairment which significantly

19

limits his or her ability to work (a severe impairment), then he or she is not disabled.

(3)     If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4)     If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)     Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the valuation process can be carried by relying on the medical vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  *Id.*

20

Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C. Plaintiff's Statement of Errors

Plaintiff alleges four errors in the ALJ's decision: "(1) Ms. Lowry suffers from an impairment or a combination of impairments that meet or medically equal one of the listed impairments in Listing 20 C.F.R. Part 404, Subpart P, Appendix 1; (2) the ALJ's reasons for rejecting the opinion of Dr. Thomas Prince are not based upon substantial evidence; (3) . . . the ALJ failed to apply the pain standard articulated by the Sixth Circuit in *Duncan v. Secretary of Health & Human Servs*, 801 F.2d 847 (6th Cir. 1986) and (4) the ALJ committed reversible error in failing to consider Ms. Lowry's treatment from Plaintiff's chiropractor, in accordance with 20 C.F.R.§ 416.913(d). (Docket Entry 9, pp. 9-10).

First, Plaintiff argues that Ms. Lowry suffers from an impairment or a combination of impairments which meet one of the listed impairments. Specifically, Plaintiff alleges that while the ALJ considered whether or not Ms. Lowry's medical impairments met or equaled Listing

21

1.04 and 12.06, the ALJ did not properly consider if Ms. Lowry's orthopedic injuries met an additional listing for impairments of the immune system, Listing 14.00 as well as Listings 1.00(B), 1.00(L), 14.09(A), 14.09(D), and 14.09(E) which deal with inflammatory peripheral joint or axial arthritis and/or abnormal curvatures of the spine.  (Docket Entry 9, Pages 10-11).

The Magistrate Judge would first note that Plaintiff has the burden of demonstrating that her impairments are included or equal in severity to those included in the Listing of Impairments.  *Evans v. Secretary of H.H.S.*, 820 F.2d 161 (6th Cir. 1987).  Further, a treating physician's conclusory statement that a Plaintiff met a particular listing is inadequate to establish the presence of a listed impairment absent evidence of the medical findings required for that listing. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).  Further, the evidence must not only show that a listed impairment is present but also that it has lasted or is expected to last for at least twelve months.  *Listenbee v. Secretary of H.H.S.*, 846 F.2d 345, 350 (6th Cir. 1984).  Lastly, in determining whether a claimant equals a listed impairment, the Secretary must consider all of the claimant's impairment's in combination.  *Lankford v. Sullivan*, 942 F.2d 301, 306 (1991).

In the instant case, Plaintiff cites to the opinions of Dr. Johnson and Dr. Prince, both of whom note that Ms. Lowry has suffered from a loss of a normal lordotic curve as well as mild spondylosis of the facet joints throughout the cervical spine.  (Tr. 196, 244).  Further, Plaintiff notes that the record is replete with Plaintiff's allegations of pain over a four year period, when being treated by both Dr. Prince and Dr. Newton as well as references to joint pain and swelling and difficulty in functioning normally.  While this is true, the Plaintiff must demonstrate that her injuries rise to severity level as defined in the listings above, specifically the required level of limitation on Plaintiff's ability to function normally.  It is the Magistrate Judge's opinion that

22

Plaintiff has failed to meet this burden. As correctly stated in the Defendant's response, Listings 1 and 14 require there to be "extreme" limitations on Plaintiff's ability to function normally, including but not limited to walking, initiating, sustaining and completing activities, and/or "extreme loss" of function of both upper extremities. (Docket Entry 15, Pages 6-7).

While Plaintiff clearly has limitations, there is substantial evidence in the record which supports the ALJ's determination that Plaintiff's injuries and resulting limitations do not meet or equal one of the listed impairments. While the ALJ specifically determined that Plaintiff's injuries did not meet Listings 1.04 and 12.06, his same rationale can be used when analyzing the listings brought up by the Plaintiff. There is evidence of only mild or minimal injuries and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination. (Tr. 16-17).

In fact, Dr. Johnson found that while x-rays showed mild spondylosis of the facet joints throughout the cervical spine, a bone spur at C-5, loss of a normal lordotic curve, and significant restrictions in cervical motion as well as paraspinal muscle spasm, Plaintiff would have difficulty performing any overhead lifting, but should be able to occasionally lift and carry 10 to 15 pounds, frequently 10 pounds, and sit and stand or walk for up to six-hour intervals. (Tr. 196). This clearly does not demonstrate that Plaintiff's injuries would rise to level of severity needed by the listings brought forth by the Plaintiff. Further, while Dr. Prince opined that Plaintiff was permanently disabled, both Dr. Johnson and Dr. Bounds rejected his opinion as not supported by objective medical evidence. Also, for reasons later discussed, Dr. Prince's own treatment notes do not support such limitations. Additionally, Plaintiff's reported daily activities and examination results do not show such extreme limitations as Plaintiff could walk with a

23

normal gait, do her own housework including laundry, sweeping and vacuuming, groom herself, take care of four pets including two dogs, grocery shop and drive.  (Tr. 196, 215, 217).

Further, there is nothing in the record which suggests that Plaintiff meets listing 14.00, which involves deficiency of one more components of the immune system.  Plaintiff must demonstrate that she had a history of joint pain, swelling, deformity, or inflammation which causes the inability to ambulate effectively or an inability to perform fine and gross movements effectively.  While Defendant argues that Plaintiff's diagnosis of traumatic, rather than inflammatory, arthritis does not meet this listing, the Magistrate Judge finds that this distinction is unnecessary as the same reasoning as above supports the ALJ's decision.  Quite simply, there is substantial evidence in the record in the opinions of both Dr. Bounds and Dr. Johnson that the Plaintiff had the RFC to perform either a light or sedentary position.  This, along with Plaintiff's daily reported activities, supports the ALJ's conclusion that Plaintiff did not meet the above listings.

Plaintiff's next statement of error alleges that the ALJ did not give the proper weight to the opinion of treating physician Dr. Prince.  However, the Magistrate Judge finds that substantial evidence supports the ALJ's decision on this issue.  An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments.  20 C.F.R. § 404.1527(d)(2).  Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time.  20 C.F.R. § 404.1527(d)(2)(I)-(ii).  However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20

24

C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (1994). In *Young v. Secretary of H.H.S.*, 925 F.2d 146,150 (1990), the court held that the Secretary could properly reject the opinion of a treating doctor not supported by medical findings in favor of the contrary opinion of a consulting doctor.

In the instant case, the Plaintiff argues that as Dr. Prince treated Plaintiff ten times between January 21, 2002 and September 16, 2002, and also reviewed the medical records including Dr. Johnson's March 2004 examination, Dr. Prince's opinion that Plaintiff was totally disabled should be afforded greater weight. For the reasons stated below, the undersigned finds that substantial evidence supports the ALJ's decision.

First, it should be noted that a treating physician's statement that the claimant is "disabled" does not bind an ALJ as the definition of disability requires consideration of both medical and vocational factors. Final determinations of disability are reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(1); *King v. Heckler*, 742 F.2d 968, 973 (1984).

In the instant case, Dr. Prince's last physical examination of the Plaintiff was in September 2002. His final determination was that Plaintiff had a permanent total body impairment of 13%, would need to continue on pain medications, and would need to continue her chiropractic treatment. (Tr. 258-261). Further, Plaintiff was to work no more than 30 hours per week or lift over 20 pounds. (Tr. 261). In his December 2005 deposition, Dr. Prince testified that Plaintiff was fully disabled given her severe cervical strain, bone spurs, spondylosis, facet traumatic arthritis, and degenerative disc disease. (Tr. 244, 245, 247). Dr. Prince also testified that Plaintiff could only lift less than ten pounds on an infrequent basis and had restricted walking. (Tr. 248).

25

The ALJ discounted Dr. Prince's opinion because Dr. Prince had not physically examined the Plaintiff in approximately two and one half years, his treatment records did not support the level of severity required for disability, and the claimant had not received treatment from any other physician since her last contact with Dr. Prince. (Tr. 19). Further, the ALJ gave more weight to the opinion of examining DDS physician Dr. Johnson, who examined and interviewed Plaintiff in 2004 and whose conclusions contradicted those of Dr. Prince. The ALJ also credited the concurring opinion of consulting physician Dr. Bounds, who reviewed both Dr. Prince's and Dr. Johnson's opinions. Dr. Bound's opined that Dr. Prince's opinion was not supported by objective medical evidence. (Tr. 204).

It appears that Drs. Prince, Johnson and Bounds came to the same conclusions about what Plaintiff's ailments were. All agreed that x-rays showed mild spondylosis of the facet joints throughout the cervical spine, a bone spur at C-5, and loss of a normal lordotic curve as well as restrictions in cervical motion and persistent pain and daily headaches. However, these doctors disagree as to what restrictions these ailments cause.

Dr. Prince's opinion is stated above, placing severe limitations. In contrast, Dr. Johnson concluded that Ms. Lowry would have difficulty performing any overhead lifting, but should be able to occasionally lift and carry 10 to 15 pounds, frequently 10 pounds, sit and stand or walk for up to six-hour intervals. (Tr. 196). Further, Dr. Johnson noted that there was a full range of motion in the lumbar spine and a full range of motion of all joints with exception of both shoulders where abduction and flexion were restricted to 160 degrees due to cervical pain. Additionally, Dr. Johnson found that Plaintiff walked with a normal gait and could perform normal walking tests. (Tr. 196).

26

Dr. Bounds determined that Plaintiff can occasionally lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds, can stand, walk, and/or sit for about six hours of an eight-hour workday, and is limited in her ability to push and pull using her upper extremities. (Tr. 199). Further, in reviewing Plaintiff's reported symptoms, Dr. Bounds notes that "[their] severity or duration . . . is disproportionate to the expected severity or expected duration on the basis of the claimant's medically determinable impairment(s)." Dr. Bounds noted that the Plaintiff's complaints are *partially* credible, as there is "some pain expected in [the] neck causing difficulty in [the] shoulder area when lifting [or] carrying, but not to [the] extent as alleged." (Tr. 196).

As such, the record is replete with conflicting opinions. "Determinations of disability must be made on the basis of the entire record and not on only some of the evidence to the exclusion of all other relevant evidence." *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927 (6th Cir. 1987). An ALJ has a duty to resolve conflicts in the medical evidence and the courts are bound to uphold such a resolution if supported by substantial evidence. *Id.* Treating sources opinions will bind the Commissioner only when well supported by acceptable medical evidence that is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d).

In the instant case, Plaintiff's treating physician concluded that she was disabled,[5] while other examining and consulting physicians have concluded that Plaintiff is still capable of working and/or has less restrictive limitations. Plaintiff herself indicated that her conditions improve when taking the prescribed medications and receiving chiropractic treatment. Further,

_____

[5] The Magistrate Judge notes that Dr. Prince had previously limited Plaintiff to lifting no more than 20 pounds, with no restrictions on frequency. (Tr. 261).

27

Plaintiff did work part time for over two years after receiving her injuries and participates in significant daily activities. Therefore, because there is substantial evidence to the contrary, the Defendant was not bound by the opinion of Dr. Prince that Plaintiff was totally disabled. Further, upon review of the entire record and for the reasons stated above, substantial evidence supports the ALJ's decision.

The Plaintiff's next statement of error alleges that the ALJ failed to properly consider Plaintiff subjective complaints of pain. The ALJ determined that he found the Plaintiff "to be credible to the extent she would experience discomfort with heavy lifting, or prolong periods of walking or standing." (Tr. 19). As such, the ALJ set forth these limitations in Plaintiff's RFC. (Tr. 19). Plaintiff argues that the ALJ failed to apply the pain test as set forth in *Duncan v. Secretary of H.H.S.*, 801 F.2d 847 (6th Cir. 1986) and that if he had, Plaintiff would have satisfied this test, thereby requiring a finding of disabling pain and thus, a conclusion that Plaintiff was disabled.

In *Duncan*, the Sixth Circuit determined that pain can only be considered in determining disability if there is objective medical proof establishing the presence of disabling pain or objective medical proof of an impairment which could reasonably be expected to result in disabling pain. In the instant case, the ALJ properly considered the standards as set forth in *Duncan*. In fact, the ALJ cites to the specific language from the case. The ALJ first analyzed the objective evidence which he concluded showed the existence of a medical impairment that could reasonably produce the symptoms alleged. (Tr. 18). However, the ALJ concluded at step two that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (Tr. 18). Citing to Plaintiff's daily activities and

28

testimony regarding treatment for her pain as well as the opinions of Dr. Johnson and Dr. Bounds, the ALJ reduced her RFC to no heavy lifting or prolonged periods of standing or walking.  (Tr. 19).  The Plaintiff cites to no additional evidence that the ALJ did not consider in making his determination.

Further, an ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility.  *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997)(citing 42 U.S.C.A. § 423 and 20 C.F.R. §404.1529(a)).  Also, discounting the credibility of a claimant is appropriate to a certain degree where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence.  *Id*.  As stated above, Plaintiff's daily activities and testimony as well as the opinions Dr. Johnson and Dr. Bounds support the ALJ's partial discounting of the Plaintiff's complaints of pain.  As such, there is substantial evidence in the record which substantiates the ALJ's determination that the Plaintiff is limited, but not disabled, by her pain.

Lastly, Plaintiff argues that the ALJ erred by failing to consider the Plaintiff's treatment from her chiropractor, Dr. Newton. However, it is clear from the hearing transcript that the ALJ did consider Plaintiff's treatment history by Dr. Newton.  (Tr. 279-280).  Further, Plaintiff fails to cite to any opinion by Dr. Newton which differed from the opinions of Drs. Johnson, Bounds, and Prince, which were clearly discussed in detail by the ALJ.  Additionally, Plaintiff offers no explanation of how evidence that she was treated by Dr. Newton would further support her allegation of disability.   Finally, the ALJ partially credited Plaintiff's complaints of pain based upon her diagnosed ailments, treatments, and the opinions of no less than three physicians as

29

well as a VE.  Therefore, the Magistrate Judge finds that Plaintiff's final statement of error is without merit.

## IV.  RECOMMENDATION

In light of the foregoing reasons, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record be **denied**, and that the decision of the Commissioner be **affirmed**.

Any party has **ten (10) days** from the receipt of this Report and Recommendation in which to file any written objection to it with the District Court.  Any party opposing said objections shall have **ten (10) days** from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004 (en banc)).

ENTERED this 7th  day of November, 2008.

_____
JOE B. BROWN
U.S. Magistrate Judge

`

30